The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Councilor Paterno, you may proceed. Good morning, Your Honors, and may it please the Court, my name is Lyle Paterno and I represent Petitioner Appellant James Richardson. The single most effective way to rip up this eyewitness-based prosecution was to introduce an expert to cast doubt on the reliability of those eyewitness identifications. Mr. Richardson was robbed of that opportunity for one of two unconstitutional reasons. First, the State Court arbitrarily excluded the critical testimony from Mr. Richardson's well-qualified eyewitness identification expert, not because of any balance of probative value or unfair prejudice, but because of her failure to observe the live, in-court testimony of both parties' witnesses. Alternatively, Mr. Richardson's trial counsel was objectively unreasonable in failing to appreciate and act on that admissibility requirement to ensure that the expert observed both parties' witnesses. But no court has even reviewed the merits of that ineffective assistance claim. The procedural exclusion of Mr. Richardson's key evidence is compounded by affidavits indicating that the jury railroaded the only Black male juror because he was a Black man. The district court's refusal to at least hold an evidentiary hearing on the racial animus claim cannot be squared with that juror's consistent insistence that racial animus is quote, the reason Mr. Richardson was convicted. I'm happy to proceed by discussing those three issues in the order in which the briefs presented them, but of course, I'm happy to take any questions from the court along the way as well. Thank you. The first issue presented in this case, Your Honors, is the state court's deprivation of Mr. Richardson's meaningful opportunity to present a complete defense. Here, the state's only direct evidence consisted of the inconsistent and inconclusive eyewitness testimony, yet the trial court excluded the testimony of Mr. Richardson's well-qualified eyewitness identification expert who would have testified about the very circumstances that this court in the Harris decision made clear provided a legitimate basis for an eyewitness identification expert to help the jury. These are circumstances like the effect of stress, the effect of alcohol, cross-racial identification, how exposure to media could affect eyewitnesses' memory and confidence, how a lapse in time since the event in question and the witness's statement could affect the eyewitnesses' confidence and memory. But Mr. Richardson was deprived of the opportunity to present that witness not because the trial court identified any limit on its probative value or because the trial court identified any risk of unfair prejudice. The only reason the trial court excluded Dr. Van Wallendaal's testimony was because that expert had not seen all of the eyewitnesses' live in-court testimony. And that's clear from the- Counsel, can I ask, so I want to make sure I understand your argument here. And even if I accepted that you could read the state court's ruling to be as limited as you suggest, you know, we've been instructed repeatedly that we don't read state court opinions as narrowly as we possibly can, in fact, quite to the contrary in the habeas context. And it strikes me that probably the best reading, but at least a plausible reading, was that that was evidence or that was information that was considered as part of the 403 balancing. Help me understand why that's not the way to look at it and what's wrong with that argument from your perspective. Sure, Judge Richardson. Thank you for your question. To be clear, we're not quibbling over the state court's 403 balancing. Our position is the state never engaged in that. The state court never engaged in that balancing. And that's clear from the record. It's clear from the state court's own rulings. The trial court dealt with this issue in three sentences. At JA 2012, the state court says, regarding the testimony proffered in the voir dire of Dr. Laurie Van Wallendal, the court finds that the witness has visited the scene and reviewed the statements and has reviewed the line of materials dealing with discovering this case. The court finds that she has not interviewed all the witnesses and has not observed all the eyewitness testimony. And the court concludes the probative value is outweighed by undue prejudice. And the court of appeals repeats that finding, but then goes on to add, since Dr. Van Wallendal did not hear the testimony of the defense witnesses, she would have only testified about the reliability of the state's witness identifications. Therefore, the trial court did not abuse its discretion by concluding that the testimony would have been unfairly prejudicial. Your Honors, this was the basis for the state's objection to Dr. Van Wallendal's testimony. At JA 2011, the state urged the court, saying, Judge, I think that had Dr. Van Wallendal heard every witness in this case and interviewed every witness in this case, perhaps even then we would object to it. But at least it would be across the board. She would interview every witness, both defense and the state. What I'm saying, I've read it, right? I don't need you to read it to me. The point of that is, is that, yes, that is the fact. That is the fact that is going into the 403 balancing. Every time you do a 403 balancing, you're considering an array of facts. They highlight that fact. But what you seem to suggest, that we have to read the appellate court decision, which talks about balancing, we've got to read the trial court's decision, as only about that single fact. That seems like an unduly narrow read. And tell me, I guess mine is sort of more the legal point of, why do we not give it the benefit of the doubt when it appears it could at least plausibly be read that way? Well, Your Honor, certainly on habeas, this court does provide deference to the state court. But here, I think that it's impossible to read the court's decision as connecting that factor and any of the factors the court talks about with the requisite balancing it was to under Rule 403. The court doesn't talk about how the fact that Dr. Van Wallendaal had not... But you do agree that it was excluded under Rule 403. Oh, yes, sir. Yes, sir. It was excluded under Rule 403, but that's the same as in Holmes and the Supreme Court's decision in Holmes. The South Carolina Supreme Court there affirmed the exclusion of evidence under Rule 403. And the Supreme Court said that the exclusion was arbitrary because the court did not focus on balancing probative value and prejudice. Instead, the rule there was something called... The court applied Rule 403 through something called the Gregory Rule. And the court said that that specific application of Rule 403 was arbitrary and disproportionate to the purpose of Rule 403. And here, the North Carolina courts make clear that the purpose of Rule 403 is to ensure that... In this kind of circumstance, to ensure that an expert witness can provide appreciable help to the jury. And our point is that by excluding the witness based on her failure to observe all the eyewitnesses, the court didn't link that factor to determining whether or not the expert could have provided appreciable help to the jury. It didn't perform the kind of balancing that the courts are required to do under Rule 403. And Holmes makes clear when a court applies Rule 403, it actually has to engage that kind of balancing. And so we don't contest that the court applied 403 or even that the court has a lot of discretion. But our point is that the court abuses that discretion necessarily when it fails to conduct the balancing required under that. And we think here, there's simply no connection between the facts that the court stated and either any limits on the probative value or any risk of unfair prejudice. And if you look at the voir dire where Dr. Van Wallendal explained what she would be testifying to, that becomes clear. She would have helped the jury to understand how, in this case, for example, where the witness had been in the blink of an eye, a car zoomed by, it was 2 a.m., it was dark, all the witnesses had been consuming alcohol, it's at a bar, at a nightclub, there had been a fight, everyone's stressed, Dr. Van Wallendal would have been able to explain to the witnesses how, for example, those circumstances leave gaps often in witnesses' memory. And they have this expectation factor where they fill in those gaps with different facts maybe they do recall from the evening. So, for example, if they had seen my client in an altercation earlier in the evening, perhaps they fill in those gaps about who was running to the car or maybe even who was in the car based on that prior information and not based on accurate memory of the actual incident. And that's information that the jury could have used and certainly the defense would have used to undermine the state's prosecution here. But Mr. Richardson was not allowed to do that. And there's no question in this case, Your Honor, that the state's prosecution turned on eyewitness evidence. And you don't have to take my word for that. The state told the jury the way we proved this case was through having lots of eyewitness testimony. And it not only told the jury that in closing, but then it marched through all the eyewitnesses' testimony. It bolstered the eyewitnesses' credibility. It said things like the state has a duty to put credible witnesses on the stand. Our witnesses could not have testified if they were not credible. The state told the jury that. The state went on to then exploit the very circumstances that Dr. Van Wallendaal would have testified about. For example, the state said, here, these kids saw an event that seared in their memory. They're never going to see anything like this. How could they, you know, ever forget this? And, in fact, Dr. Van Wallendaal would have testified that it's the exact opposite, that because of the stress of the situation, there actually were probably holes in memory. And it inflated the individual's confidence and that they might have pulled information from earlier in the evening or also from the extensive media exposure. The record makes plain, Your Honor, that immediately after the shooting, the bar owner here went to the Internet, pulled up my client's picture based on his involvement in a prior fight, and gave that picture to the police. And within hours, there were statements by the police saying, we know that Mr. Richardson did this. We have the death penalty in North Carolina. There were wanted posters of my client all over town. There was media exposure, extensive media exposure, all over the newspapers and in the news. And several of the witnesses conceded that they had been exposed to that media, both before they made their – some of them before they ever made an initial statement and certainly before they testified in the case. And Dr. Van Wallendaal would have been able to testify to all of that information and help the jury to better understand the circumstances. Yes, Your Honor? You're coming up on time, and I just have two sort of factual questions I wanted to be sure that I understand. For your second argument, the ineffective assistance of counsel claim, and you argue cause and prejudice, you are not arguing, I take it, that the cause and prejudice comes from ineffective assistance of appellate direct appeal counsel. That's right, Your Honor. That's right. I didn't think so. I just want to make sure. And then, sorry, one other question, and then I'll let you get back to the other things. I'll make sure that I understand it. In the racial animus claim, you argue on appeal that this is a new claim because it was failed to be developed by the state PCR court and it should get to NOVO review. When I look below at both the habeas application and the Rule 59e filings, I don't see any suggestion of that. In fact, I see the argument that this is an improper application under 2254D, not that this is a new claim subject to NOVO review. Can you point me in the record where you made that argument below? And obviously, I don't mean you personally, but where your client made that argument below. Well, I think you're right, Your Honor, that my client below argued that this was an unreasonable application of federal law. And we think that because, as you mentioned on appeal, we argue that because the state court didn't allow the factual development here to occur, that under this court's cases in Winston 1 and Winston 2, that that means the state court never decided this issue on the merits. But even if this court finds that the NOVO review isn't appropriate, I think for the reasons we argue that Pena Rodriguez did not announce a new rule, those are the same reasons why the long line of precedent explaining that racial animus cannot infect a jury verdict, that long line of precedent surely was clearly established prior to my client's conviction in this case. But here, as you mentioned, Your Honor, no court has ever even reviewed and considered the affidavits. And so that's all we're seeking on the racial animus claim is for an opportunity for my client to be able to present those affidavits and have an evidentiary hearing pertaining to the statements. And they're pretty egregious statements in there where the juror, Anderson, says that he was pressured by these other jurors who are yelling and screaming and accusing him of voting not guilty only because he was black. And he leaves no doubt in those affidavits that he ultimately was pressured to change his vote from not guilty to guilty because of the racial animus, and specifically says that that is the reason that Mr. Richardson was convicted. So I see that. I'm just going to follow up with one, Chief, if I may. With respect to the affidavits, given Penholster, what argument was made, since they didn't argue it was a new claim below, what is the argument that they relied upon below that we can look to for admitting the new affidavits? So I understand your argument now on appeal is that it's a new claim, so therefore it's not barred by Cullen. I at least understand that argument. But below, they don't make that argument below. They seem to just say they should come in without an explanation. Can you point me to where I ought to look for what argument he made below about why these, I think, two or three Anderson affidavits ought to come in, the new ones, not the original? That's right, Your Honor. The first affidavit, to be clear, Mr. Anderson's first affidavit was before the state court. And we think that's sufficient here. The other two affidavits make clear the kind of testimony that could come out in an evidentiary hearing. But the first affidavit was certainly before the state court. And there's no question about that. The state court refused to consider it and said he could not consider it. But there's no question that that affidavit is in the record. You're right that the district court granted a motion to strike the second affidavit, Mr. Anderson's second affidavit, and the third affidavit. I don't believe there was ever any ruling on the third affidavit. That was provided on the Rule 59 EU motion. So, Your Honor, if there are no further questions, I'll just end here. In this record, A.G. has a question. Go ahead. I just want to be sure I understand your argument on the racial animus part. Your argument is not that the speaking juror, whoever that was, had animus toward the defendant. The animus was toward the other juror, Anderson. Well, Your Honor, we argue both. We argue both. It's clear from the affidavits that the other jurors directed racial animus towards Juror Anderson. That is what he says. And there's no question about that. If we're going with the affidavit that was before the PCR court, I don't remember anything that was directed toward the defendant and that there was only one speaking juror. So it's on that basis that you would have to claim the speaking juror had animus. That is clearly a Pena-Rodriguez claim. But the claim that the speaking juror did not have animus toward the defendant, but animus toward a specific defendant, is there any case after Pena-Rodriguez that has adopted that line of reasoning? We're not aware of a case, Your Honor, that adopts that reasoning. There certainly are cases, for example, the Buck case just from a few years ago in the Supreme Court, that makes clear that racial animus, the Supreme Court is committed to eradicating racial animus from jury trials, period. And so we think that even if the racial animus were not directed directly to our client, we still think that it warrants an evidentiary hearing to determine whether racial animus was nevertheless the but-for cause of the guilty verdict here. But to be clear, we do argue both, Your Honor. We think that if the jurors, the other jurors, directed racial animus to Mr. Anderson because he was a black man, then it blinks reality to assume that those same jurors did not project the same racial animus towards my client, who was also a black man. But then the second issue is, as you described it, Your Honor, it's whether racial animus was a significant factor in the guilty verdict here. And we think that the affidavits show that it was because Mr. Anderson would not have voted guilty but for the racial animus. We say racial animus, we call it racial animus. It's almost euphemistic to even call it that. We talk about, of course, we don't know because we haven't been allowed to have evidentiary hearing to dig into it. But Mr. Anderson said that he was told that because he's black, because you're black, only because you're black, that's the only reason why you're voting the way you are. Nothing about your intelligence, about looking at the evidence, anything, because you are black. I can't think of any more insidious than that. We allow that and that's just passed up. Well, that's not to the person. And this is not this case, but to say that that's not to the person, to the defendant, just to that juror, it would be like somebody saying that you're on a jury and they said, listen, I tell you, you need to vote the way I want you to vote. And use racial type things and say that. And he said, well, no, there was no animus because it was not directed toward the defendant. The whole point is an independent juror. We protect them a great deal. We don't want people to talk to them. We sequester them sometimes. They can't go back to their homes. And here's a case where you're told directly, and more importantly in this case, because there was an Allen charge. Because the Allen charge, of course, as a defense lawyer, that's the worst charge there is. Because in so many words, it's saying, listen, you still have your independent judgment, but you ought to listen to what the other people say. That intensified being told you're only doing this because you're black. And that stands on a court of justice in America in 2021? To just undermine his intelligence? Everything. Like somebody said, well, you know, you're a woman. Just because you're a woman, that's the only way you see it that way. That's horrible. It's insidious. I mean, this is, and we've recognized for a long time that racial animus in terms of a jury's independence and to be able to do so is a part of our DNA as our justice, I would hope. It's a watershed rule. It's not just new. I think Peter Rodriguez does have collateral, I mean, retroactive impact. You're looking from just the analysis of it. But this is incredible that this animus is only somehow cabined just to that juror and is insulated from the whole process of a fair juror. How could he have a fair trial when one of his jurors, alleged, we don't know it's true or not, was just taken out in terms of that because you're black? You're only doing that. And the court didn't know that, but it charged them, you need to listen to your fellow jurors. And based on this, this is what's being told to me by my fellow jurors. You need to fall in line because you're black. That's why you're not falling in line. That's the case. We call it racial animus. Call it what it is. This is a court of fact and truth. Let's at least adjudicate the case on the truth, not just animus that's floating in the air. It's one of the most insidious things I can imagine. That's right, Judge Gregory. And, again, we're asking just for an evidentiary hearing for the opportunity to bring out the truth that you're talking about. The juror, Anderson, has never had an opportunity to testify about these statements, and that's what we're seeking on remand. All right. Thank you. Mr. Vlahos. I don't know if I pronounced that correctly. Thank you, Your Honor. Vlahos, yes, sir. Vlahos, yes. Thank you. Thank you. May it please the court, I'm Nick Vlahos, Special Deputy Attorney General, North Carolina Department of Justice, for the respondent. I'm going to start with issue three where the court left off just now. Racial animus and stereotyping like the kind described in Pena-Rodriguez v. Colorado is abhorrent in all respects and has no place in our criminal justice system. But Richardson's case is not like Pena-Rodriguez. Instead, Richardson's case is substantially similar to a matter this court addressed in United States v. Burchette, a decision based on Pena-Rodriguez. Both the United States Supreme Court and this court have recognized that a juror coming forward with compelling evidence, that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in that juror's vote to convict, is a threshold showing a litigant must make to obtain relief under the narrow exception to the no impeachment rule announced in Pena-Rodriguez v. Colorado. Now in Burchette, after a federal jury convicted the defendant, an African-American male, of several firearms and drug-related offenses, he requested leave to interview jurors for evidence of racial animus. The district court denied his request and Burchette appealed. On appeal, Burchette argued he was constitutionally entitled to interview jurors under Pena-Rodriguez because after the verdict, a male African-American juror approached the defense team and told them about statements other jurors made potentially suggesting racial animus. In concluding that the district court did not abuse its discretion in denying Burchette's request to interview jurors in search of evidence that could be used to impeach the jury's verdict, this court found, even accepting arguendo, that all the proffered evidence was reliable. None of the statements here required the district court to find that defendant would likely uncover evidence that racial animus was a significant motivating factor in the jury's vote to convict. Especially relevant to Richardson's case, this court reached the following conclusions regarding evidence proffered in Burchette. Regarding evidence that a white lady said the two of you are only doing this because of race and that a juror said it's a race thing for you, this court said, even assuming that the white lady was a juror, these statements need not suggest that the speaker's racial animus in any way impacted her vote to convict. They can reasonably be interpreted by the district court as a sort of offhand comments that the Supreme Court held are insufficient to overcome the no impeachment rule. And they certainly fall short of the statements presented in Pena-Rodriguez, in which a juror allegedly argued for a guilty verdict because the defendant was Mexican. That's the words of this court. Another part of this court's decision in Burchette said, it's regarding Burchette's argument that a female African American juror's request to be excused from the jury shortly after the trial court gave an Allen charge and shortly before the final verdict provides good cause to interview jurors. This court stated that hardly required the trial court to believe that one juror's request to be excused provides compelling evidence that another made clear statements reflecting a vote based on racial animus. And. Counsel, thank you so much for that. You did a great job of Burchette looking at it. And the more you talk, the more to me I want you to address it. It's clearly how it's in opposite here. Here, it was question there. You have the question that to speculate as to what impact the person made the comment. What impact it had on her decision. We didn't know. We don't know what impact it was. Somebody requesting to be excused after an Allen charge. We don't know. But here, this is different. This is a person saying that at least that we don't know that we have fact finding for. I was attacked because I was black and told that's the sole reason I was making the decision. Not only that, in the context of this Allen charge, and you have also that is I changed my vote solely because of this. So we don't have to speculate here. Burchette is clearly not controlling here because what was missing there is here. He said not only she said it to me. He didn't say she said it, period. She said it. I resisted it. And finally, I was born down that I voted even when I didn't believe. In fact, he was guilty. That is awesome. You can't just fuse something away. You know, a fact is a stubborn truth. Some facts you just whisk away and turn your eye, but facts, but truth, it's stubborn. It's stubborn. He said that's how I voted because I was made to feel that because of my color, black, I could not be independent. And I needed to do this. That's what he said. So how do we count? How's how's Burchette controlling there? We know. We know. At least as a ledge, but impacted hair. Am I correct? Council was a unanimous verdict required. Your Honor, you're correct. That is unanimous. Am I correct? Then if one of those jurors was intimidated because of his color and directly that and his will was so born that that would have an impact on the vote on the on the verdict. If he still believe that person was innocent, but did so because of the way he was attacked because of his color. How's Burchette controlling on those facts, these facts? Your Honor, because Burchette and Pena Rodriguez require a threshold showing before judicial inquiry, before the judges can step into the jury room during deliberations and find out what's going on there. First, a threshold has to be met. And the threshold was not met in this case. No, no, no, no, no. What is the threshold? The threshold is that a juror coming forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor. In fact, jurors spoke to convict. Well, first of all, every case is not going to be all fours because you're telling me that is more powerful to have somebody say, well, they said something that may have indicated how they would have voted. That's more powerful than evidence that they said something based solely on race that made another juror intimidated to vote for something they didn't believe in. How could that be? That's like Holmes said, that the life of the law is not logic, it's experience. I don't see how anybody could come with that in a common sense to come up with that. That wouldn't be more powerful. You're sitting there, think about it. You know, you're sitting in the room and everybody look at you like, you know, you're black. You know, you know, you need to, you're only doing this because you're black. And you hear this. I suppose you had to be someone who'd been in a situation where a dominant minority didn't sort of, didn't sort of just say that. And then he said, and he voted. He tried. Didn't he try to get off the jury? Yes, Your Honor. Right. He tried. That corroborates how deep it was. That's all corroboration here. There's none so blind as the one who will not see. Go ahead, counsel. Okay, Your Honor. Your Honor, first I think Burchette is applicable to this case, Your Honor. And the second thing, what you're describing is not the juror's statement of racial animus. What you're describing is Mr. Anderson's, in this case, reaction to a question that somebody asked him. Okay, the statements in Burchette were statements and these were questions. That's one thing. But another thing on top of that, the United States Supreme Court never intended Pena-Rodriguez to be interpreted as Richardson is arguing in this case. They never intended that. And we know that. In their opinion, they said, right after they gave the rule, they said, not every offhand comment indicating racial bias or hostility will justify setting aside the no impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Well, yeah. You see, you just said that. You have to look at it in the context of the jury. It had an impact on the jury's verdict. Because a juror's verdict is influenced by any one of them. And I'm sorry, are you saying that the statement was not racial animus? Did not reflect racial animus? Are you saying that? I'm saying that it was a question. I'm asking you. Are you saying that that's not evidence of racial animus when you tell somebody you're only voting this way because you're black? I want you to answer that question. Are you saying that's not racial animus? The question you're asking me. Yeah, and I want an answer to my question. Yes. Could it be? Yes. No, no. You understand it, so answer my question. Is that evidencing racial animus? And we don't know if it's said because he's been barred so far from getting in to dig into this. But are you saying that that statement does not evidence racial animus? I'm saying that it can. No, it can? Yes, Your Honor. But it can based on what? What would be the option that is not? Well, Your Honor was talking about. I'm talking about my question. My question is give me the option when it's not. You said it can. Then I know logic that was suggested there are other circumstances where it's not. Give me the one when it's not racial animus. Well, the question in this case that was posed to Mr. Anderson was not based on racial animus. It was based on a desire to find out why he was voting not guilty. Why? Oh, my. She didn't say. She said that you were told that that was the reason. Are you changing the facts? No, Your Honor, not at all. Oh, I think he said you voting that way because you're black. That's not what he said. They asked a question. Are you voting this way because do you know Richardson's family? Are you voting this way because you're a black male about the same age as Richardson? They weren't discriminating on him based on his age. They weren't discriminating on him based on who he knew. And they weren't discriminating on him based on his race. They were asking in light of all this evidence showing Richardson's guilt, why are you continuing to tell us that he's not guilty now? Let's talk about this. Let's open discourse. Let's speak freely about it. And, Your Honor, that's if you take… Well, I see. I see. I understand. Well, if you take… I guess the only way the court is to rule for you is to believe what you just said, that that's not racial animus. No, Your Honor. It's just like the argument that Thurgood Marshall made in Brown. He said the only way that respondents can win this case is you have to believe there's something intrinsic about black people being separated in schools. So you're saying that this has nothing to do with race, not even a question. Is that right? Your Honor, I'm saying if this court follows a clearly established United States Supreme Court precedent, then the state prevails in this case. These are the United States Supreme Court words, not my words. Not every offhand comment indicating racial bias or hostility will justify setting aside the no impeachment bar. Just because a statement has racial animus or hostility does not mean that it automatically, you get rid of the no impeachment bar. The United States Supreme Court was very careful when carving out an exception to the no impeachment rule to use a scalpel and not a meat cleaver to try to do so because juries are that important. Our entire system depends upon it. Our jury system depends upon the willingness of jurors to serve and speak freely during deliberations. And as this court recognized in Burchett, the willingness of jurors to serve and to speak freely during deliberations depends on the no impeachment principle. In the United States Supreme Court's words, the no impeachment rule promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged, they will not be summoned to recount their deliberations and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts. And Your Honor, that's why the United States Supreme Court separated- That's what the United States Supreme Court said. So we have to protect statements like this. No, Your Honor. What I'm saying is the United States Supreme Court created two categories. In one category are offhand comments indicating racial bias or hostility. On the other side of that is a statement just like what happened in Pena Rodriguez v. Colorado, where that juror said, I believe this Mexican guy committed this crime because he's Mexican. And I know from my job in law enforcement, which are essentially the facts, that Mexican guys are more forward with women, that they're more likely to commit sexual offenses against women, so I'm going to find him guilty. That's not anything near what happened in this case, in Richardson's case, Your Honor. Well- That's the state's argument. What happened in this case was that a juror changed his mind and voted guilty when he didn't believe that he was guilty. That's not a serious consequence of this? Your Honor, I'm not arguing that it's not a serious consequence for somebody- It's the most serious consequence there is, isn't it? It is, Your Honor. It is. Absolutely. It was not the same facts, but the consequences are quite serious, unless people don't care. If you don't care, I don't think the Supreme- For example, when you talk about cases like this, they're very charged, very charged cases, and you're talking about, you're right, jurors ought to be able to come down there, and I don't think they ought to come down there thinking that somebody's going to question them because of their color or their sex or their ethnicity or anything about their sexual orientation or whatever. They ought to come there and stand like any other citizen and appear and, yes, debate the facts of the case. Yeah, we want a robust fact, so if you say something like, oh, my goodness, you'll be stupid to believe what that witness said on the books. That's banter, but we're not talking about banter. We're talking about a conclusive statement and questions that are put to that, you know, it's like I guess you have to be, I guess, have some experience in terms of minority, but you said with just a question. For example, people ask you questions like, you know, do you live here? Well, I didn't say you didn't live here, but you didn't ask anybody else that they live in, but you talked to a black person and walked up, do you live here? You said, well, I just asked a question. And you said, oh, that was nothing about race. I just asked a question. And to a point where a juror just felt I had to succumb to this and vote guilty when I believed and still believe innocence. But that's okay. But I understand your position. You made it clear when you. Yes, sir. Also, if this court is to interpret Pena-Rodriguez in that manner that's suggested by Mr. Richardson, then any individual juror would be able to come back and impeach the entire jury's verdict post-conviction just by coming up and saying I felt racially pressured because so and so said this. That's not what Pena-Rodriguez was designed to do, Your Honor. That's the state's position. Oh, I see you're going with the slippery slope argument now. If we allowed this door, the door would be so open wide the jurors would be flocking in saying this. I don't think that's the case. I don't think that's the logic of it, not the consequences of it. You know, it takes a lot for a juror to do this. And a lot of times people are, many times are not quite persuaded fully, but they go on and it's a unanimous verdict. You know, so, but I agree with you that that became a cascade, but a slippery slope is a very tenuous way to thin here in terms of when these cases like this, you were talking about investigating it. And, well, never mind. Well, go ahead and finish up. Your Honor, to go on to another issue, if there are no further questions on this issue. Judge Richardson has a question. Can you just spend a minute, which is sort of what you got, responding to your colleague on the first claim, not the ineffective assistance of counsel claim, but the claim to a due process violation to have excluded the expert's testimony under 403? Yes, Your Honor. First of all, just to cut to the chase, based on the overwhelming evidence of guilt presented in state court proceedings, this court should reject both Richardson's expert's witness claim and his ineffective assistance of counsel claim. Richardson was identified as a shooter by Vidal Thorpe, a member of the same race who only had one beer before the shooting, watched no media coverage of the shooting, and knew Richardson because they frequented the same bar for months and played pickup basketball together at a local high school. His being the person who identified Richardson in the car substantially lowers the probative value of an eyewitness identification expert testifying. And, Your Honor, not just him, but Jeff Seeley, other people in this case, they knew Richardson from before, okay? Jeff Seeley in particular. He knew Richardson because Richardson bought him a drink and talked to him on the night of the shooting before Richardson got into an altercation with bouncers outside the OP. When Seeley heard Richardson threatened to come back and kill the bouncers, he left because he thought Richardson was serious. As he was leaving, Seeley saw Richardson go to the white BMW, pop the trunk, pull out a handgun, cock it back, and get in the BMW, which drove the wrong way down a one-way street to get to the front of the OP where shots were fired. Rachel Burt agreed with this, or she corroborated this testimony, but she couldn't identify Richardson. And also, Richardson is not the type of person who blends into the crowd, okay? He was the tallest guy there, and he's a black male with very light skin, okay? In fact, he had the lightest skin of the group he was in. His brother, Andre, has slightly darker skin than him. Kyrio Arrington, who was there with him, has much more darker skin than him and had long dreadlocks. I think you're over time. I'll just give you the opportunity to give a brief response. No, you keep on. You can go ahead. He was light-skinned. What did you say? He stood out, right? He stood out in the crowd, Your Honor, yes. And that was responsive to Judge Richardson's question about the funding. That's all a matter of goes to the weight, isn't it? Was that the reason given for not allowing that testimony in terms of the expert? Your Honor, the reason for not allowing the testimony is that the defense was trying to tailor the testimony. They only wanted their expert to testify as to the state's witnesses except for and not their two witnesses. Their two witnesses got up there and identified somebody who's clearly not Richardson. But the eyewitness identification expert, and that's the irony of this, the eyewitness identification expert, if she testified, would have undercut their testimony. So you've got a defense who's putting on witnesses to say it's not him but then trying to put on an eyewitness identification expert that will probably end up undercutting their testimony. You know a rule that says that you have to have equal opportunity when you put on an expert, that if you put on an expert to help you, it's got to also help the other side equally potentially? I never heard of it like that. Because that's basically what he's saying. No, no, no, you've got to interview all of them so that you can put your expert through the test. That's called cross-examination. Obviously the prosecution is going to say, excuse me, you talked about those, but you didn't say anything about those, did you? That's because you didn't hear them testify, did you? No. I mean, that's the art of advocacy. But that doesn't mean you preclude, I mean, lock, stock, and burrow at 403 because it didn't do everything it needed to do. Okay, I've got to have my expert testify for you. Hire your own expert. My goodness, the government always puts on a lot of things. It's not because, well, you can't put this on because that would be unfair to the defendant because you didn't give them a chance to put their DNA on. No, that's what advocacy is. The defense has to do that. But now the defense, the metric is you can't do this because you haven't done it. They'll be available for the prosecution, their witnesses, too. It might help them, too, whatever, or show that against your people. That was the whole point of it. His expert was to show what's against me. I don't have to prove anything. I put them on, but I didn't have to put them on at all, right? At that point. That's correct. That's correct, Your Honor. So he was, you know, so, you know, okay. Well, never mind. May I respond to that, Your Honor, your question, Your Honor? Thank you, Your Honor. I didn't have a question because it's, you know, go ahead. Yes, sir. Your Honor. Anything else you want to add? Nothing else. It's all in the brief, Your Honor. Thank you. All right. Very well. Thank you so much. Mr. Paterno. Thank you, Your Honor. I'd like to address both the racial animus claim and the first claim that Judge Richardson asked about. Taking the racial animus claim first, Judge Gregory, I think you're absolutely correct. The Berchette is nowhere near this case. Obviously, here it wasn't an offhanded comment. The juror makes clear that this was the reason he changed his vote, and he talked about the – I think my colleague tries to strip it of the context, but the affidavits make clear that he was, quote, bombarded by the hostile attitude of these other jurors. And he says he was scared. He was scared for his kids. This is a case that was racially charged. The whole community knew about this case, was involved in this case. As explained, there was extensive media coverage. He had reason to fear from the other judges – or, excuse me, the other jurors' racial animus. And as Your Honor mentioned, he tried to get off the jury, and the trial court sent him back and said, figure this out. You have to reach a unanimous jury verdict. And another reason it's different, Your Honors, is that my colleague talked about how in Berchette – There are two things, though. You just mentioned the juror getting off and the Allen charge by reference. Both of those were in Berchette, too, right? There was an African-American juror who tried to get off, and there was an Allen charge in Berchette, right? Am I remembering that correctly? I think that's right, Your Honor, if I recall those facts correctly. But another key difference with Berchette is that there, the statements from the juror, as my colleague mentioned, are these comments after the fact from a juror just minutes later to the defense counsel. Here, we're not seeking to interview additional witnesses. That's the relief that was requested in Berchette. Here, we have a juror who came forward on his own volition and swore in an affidavit, and now in three affidavits, swore to the facts that are included in there. And so all of my colleague's worries about slippery slope or comments about forcing jurors to come back and testify, that's really not at issue here. We have a juror who's begging to testify and say that an injustice was done here. The only reason that Mr. Richardson was convicted was because of racial animus. And I think my colleague's comments about how these statements could reflect racial animus, that's just even more reason for the need for an evidentiary hearing here. Again, we're not asking to overturn the verdict based on this. At this stage, we're just asking for an evidentiary hearing so the truth can emerge. And on the second issues, Your Honor, on the due process claim, my friend on the other side went straight to prejudice and said that there was an overwhelming evidence of guilt, and he mentioned Vidal Thorpe. Well, Your Honor, it's important to put it in context. He did not come forward until 22 months after the incident. Mr. Valhos mentioned that he was familiar with my client. Well, if he was familiar with my client and saw that this had happened, you would think he would have come right away. But in any event, he waited until two weeks before trial when he was coaching the prosecutor's son or child on a soccer team and made this statement. And that is absolutely the kind of circumstance that Dr. Van Wallendaal's testimony would have helped the jury to appreciate, how that almost two-year lapse in time could have affected Vidal Thorpe's memory and his confidence. But the jury was never allowed to hear that. And my colleague mentioned that the defense was trying to tailor the expert witness. Well, of course, as you mentioned, Judge Gregory, that's what litigation is. You try to tailor your witness. The expert here never interviewed Mr. Thorpe or heard his testimony. You're right, Your Honor. The expert never saw his live testimony. She did read his testimony, and she read all the statements in the case. She visited the crime scene. She had engaged in extensive case-specific preparation here. But you're right. She did not see Vidal Thorpe's testimony. But that didn't stop the prosecution from asking her about Vidal Thorpe in the voir dire. If you look at the voir dire testimony, the state makes the exact points that Mr. Vlahos is raising here, saying, well, isn't Mr. Thorpe of the same race, and what if Mr. Thorpe only had this many drinks over the night, those kinds of things. There's no reason, as Judge Gregory mentioned. I thought trial counsel at the trial told the trial judge that he could not ask the expert witness any questions about Mr. Thorpe. Well, you're right, Your Honor, that the defense counsel did not plan to ask on direct examination any questions of Dr. Van Wallendal about Thorpe. But my point is that in voir dire, the state on cross-examination asked Dr. Van Wallendal about Thorpe, and that shows that if she had been allowed to testify before the jury, the state could have posed those same questions. And even if the state hadn't, here Dr. Van Wallendal was not planning to testify about any specific witness's credibility. She could not have testified about that. Rule 608 of the North Carolina Rules of Evidence preclude an expert witness from testifying about a witness's credibility. Here, Dr. Van Wallendal would have talked about these circumstances, and the jury would have then been equipped to understand how these circumstances cut across the different witnesses and could have applied it to any of the witnesses that the jury had heard. And so the fact that the defense counsel did not plan to ask Dr. Van Wallendal about Thorpe didn't limit the probative value of her testimony in any way. I see that my time is up, Your Honor. Unless there are any further questions, we'd ask for vacatur, we'd ask for remand, and we'll rest on the briefs. Thank you so much, counsel. I want to thank you both for your arguments. Well done. We would love to come down and shake your hand. We can't do this, but know very much that we appreciate your arguments, and we hope that you will be safe and continue to do well. Take care, counsel. Thank you. Thank you, Your Honor. Take care.
judges: Roger L. Gregory, G. Steven Agee, Julius N. Richardson